**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Criminal Action No. 23-cr-00301-NYW-1

UNITED STATES OF AMERICA,

     Plaintiff,

v.

EDWARD MARTIN JONES,

     Defendant.

---

## ORDER ON PRETRIAL MOTIONS

---

This matter is before the Court on the following motions filed by Defendant Edward Martin Jones ("Defendant" or "Mr. Jones-El")[1] on November 1, 2024: (1) Motion to Dismiss Count One of Indictment—Civil Rights Restored ("First Motion to Dismiss"), [Doc. 50]; (2) Motion to Dismiss Indictment—Detainer ("Second Motion to Dismiss"), [Doc. 51]; (3) Motion to Dismiss Count One of Indictment—*Bruen* ("Third Motion to Dismiss"), [Doc. 52]; (4) Motion to Dismiss Count One of Indictment—*Bruen* Preservation ("Fourth Motion to Dismiss" and together, "Motions to Dismiss"), [Doc. 53]; and (5) Motion to Exclude Evidence Pursuant to F.R.E. 404(b) ("Motion to Exclude" and together with the Motions to Dismiss, "Motions"), [Doc. 54].

---

[1] Although Defendant is identified as "Edward Martin Jones" in the Indictment and other court documents, *see, e.g.*, [Doc. 1; Doc. 28], he identifies himself as "Edward Martin Jones-El," in his own filings, *see, e.g.*, [Doc. 50 at n.1]. Accordingly, the Court refers to Defendant as Mr. Jones-El but does not order the Clerk of the Court to change the caption in this case, which presumably reflects Defendant's legal name.

The Government opposes the Motions.  *See* [Doc. 61; Doc. 62; Doc. 63; Doc. 64; Doc. 66].  Defendant did not file reply briefs or seek leave to do so, and the Court took the Motions to Dismiss under advisement on December 2, 2024.  [Doc. 70].  For the reasons set forth herein, the Motions are respectfully **DENIED**.

## BACKGROUND

### I.    Factual Background

At approximately 4:38 a.m. on August 18, 2018, law enforcement officers responded to a call of a shooting near East Colfax Avenue in Denver, Colorado.  [Doc. 64 at 1].  Responding officers contacted the victim, who was bleeding from two gunshot wounds, and a witness who said he was standing nearby when he heard gun shots.  [*Id.*]. The witness stated that seconds after the gun shots rang out, he saw a Black male[2] running from the direction of East Colfax Avenue, and the witness provided a description of the shooting suspect to officers.  [*Id.*].

At approximately 4:44 a.m., responding officers observed Mr. Jones-El within two blocks of the shooting and matching the description of the suspect.  [*Id.* at 2].  When officers attempted to contact Defendant, he fled.  [*Id.*].  A brief pursuit ensued, during which officers observed Defendant discard a handgun from his waistband.  [*Id.*].  Officers arrested Defendant and recovered a pink Ruger model LC9 semi-automatic 9mm pistol nearby.  [*Id.*].

The same pink Ruger LC9 was reported stolen from a vehicle in Denver on July 23, 2018.  [*Id.* at 3].  Officers obtained video footage of the car break-in that allegedly

---

[2] This Court notes that Mr. Jones-El self-identifies as a Moorish American.  [Doc. 67 at 21:12, 46:22–48:13].  This Court uses the term "Black" because that is the term used by the witness.

shows Defendant stealing a backpack which, according to the victim, contained her pink Ruger LC9. [*Id.*]. Surveillance footage of the break-in allegedly also shows Defendant wearing clothing and jewelry similar to what he was wearing on the night of the shooting. [*Id.*].

## II.    Procedural Background

The Denver District Attorney's Office charged Defendant with criminal trespass in connection with the July 23, 2018 vehicle break-in and attempted first-degree murder and first-degree assault in connection with the August 18, 2018 shooting. [Doc. 54 at 2]. At trial, Defendant was convicted of all three state charges and sentenced to 32 years in prison. [*Id.*]. On December 8, 2022, Defendant's convictions were overturned on appeal due to a speedy trial violation, and the state petitioned the Colorado Supreme Court for certiorari. [Doc. 51 at 2].

On June 20, 2023, the Government filed an Indictment charging Defendant with one count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1) ("Count One")[3] and one count of possession of a stolen firearm in violation of 18 U.S.C. § 922(j) ("Count Two"). [Doc. 1].[4] The offense dates for Count One and Count Two are both identified as July 23 through August 18, 2018. [*Id.*]. On September 11, 2023, the Colorado Supreme Court denied the state's petition for certiorari. [Doc. 51 at 2]. The next day, the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives

---

[3] Defendant was convicted in Colorado state court on drug-related felony criminal charges in 1990, 1995, 2001, 2004, and 2007. [Doc. 12].

[4] On May 8, 2024, a Superseding Indictment was filed charging Defendant with the same two counts, but including additional information about the firearm allegedly involved in the charged offenses. *See* [Doc. 28].

("ATF") sent the arrest warrant issued in this case to the CDOC. [Doc. 66 at 2; Doc. 66-1]. Defendant was ordered released from state custody four days later. [Doc. 51 at 2].

But-for the hold initiated by the arrest warrant in this case, Defendant would have been released from the Colorado Department of Corrections ("CDOC"). [*Id.*]. Instead, he remained housed at the Arkansas Valley Correctional Facility ("AVCF") until September 29, 2023, when CDOC staff transported Defendant from AVCF to the Denver Reception and Diagnostic Center ("DRDC"). [Doc. 66-3 at ¶ 1]. That evening, ATF agents transported Defendant from DRDC to the Denver County Jail, which leases bed space for federal prisoners. [*Id.*; Doc. 66 at 3]. Because the United States Marshal's Office is closed on weekends, the Marshals issued a two-day federal hold to the Denver County Jail. [Doc. 66 at 3]. As a result, Defendant remained at the Denver County Jail until his initial appearance in federal court on Monday, October 2, 2023. [Doc. 66-3 at 2–3].

On November 1, 2024, Defendant filed the instant Motions. [Doc. 50; Doc. 51; Doc. 52; Doc. 53; Doc. 54]. The Government responded, [Doc. 61; Doc. 62; Doc. 63; Doc. 64; Doc. 66], and the Motions to Dismiss and Motion to Exclude are now ripe for consideration, *see* [Doc. 70].

## FIRST MOTION TO DISMISS

Defendant argues that Count One of the Superseding Indictment should be dismissed because his prior convictions are no longer predicate offenses for purposes of § 922(g)(1) due to statutory amendments to Colorado's sentencing guidelines, which render the offenses "now ineligible for inclusion," [Doc. 50 at 2–4]; and due to the restoration of his civil rights, [*id.* at 4–10]. The Court considers each argument in turn.

## I.    Defendant's Prior Convictions Remain "Predicate Offenses"

Section 922(g)(1) makes it unlawful for any person "convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" to ship, transport, or possess any firearm or ammunition, "or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g)(1).

Defendant relies on a 2013 amendment to Colo. Rev. Stat. § 18-1.3-405, which modified Colorado's sentencing guidelines for drug offenses, to argue that his five prior convictions are for crimes no longer "punishable by imprisonment for a term exceeding one year" under Colorado law.  [Doc. 50 at 2].  According to Defendant, this 2013 amendment renders his prior convictions "ineligible for inclusion" under § 922(g).  [*Id.*]. The Court respectfully disagrees.

Assuming without deciding that the modifications to Colorado's sentencing guidelines set forth in § 18-1.3-405 otherwise render the drug offenses for which Defendant was convicted "ineligible" for consideration under § 922(g), Colorado's 2013 amendment still applies only to offenses "committed on or after October 1, 2013."  Colo. Rev. Stat. § 18-1.3-405 (2013).  Here, all five of Defendant's prior felony convictions occurred between 1990 and 2007.  [Doc. 12]; *see also* [Doc. 50 at 2–4; Doc. 63 at 2]. Thus, § 18-1.3-405 does not apply to any of Defendant's predicate offenses and is not grounds for dismissal of Count One.

## II.    Restoration of Defendant's Civil Rights

Defendant primarily argues that Count One should be dismissed because he has obtained restoration of his civil rights.  Pursuant to § 921(a)(20), the phrase "crime

punishable by imprisonment for a term exceeding one year" in § 922(g)(1) does not include

> [a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored . . . , unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

*Id.* § 921(a)(20).  Under the case law of the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit"), "the rights to vote, serve on a jury, and hold public office, as well as the right to possess firearms, must all be restored under § 921(a)(20) before a prior conviction may be excluded on the basis of restoration of civil rights."  *United States v. DeVargas*, 64 F.4th 1148, 1156 (10th Cir. 2023) (quoting *United States v. Flower*, 29 F.3d 530, 536 (10th Cir. 1994)).  The Parties dispute whether Defendant's rights to serve on a jury and to possess firearms have been restored.[5]

### A.    Right to Possess Firearms

The central issue here is whether a 2022 amendment to Colorado's Possession of a Weapon by a Previous Offender ("POWPO") statute, Colo. Rev. Stat. § 18-12-108, restored Defendant's right to possess firearms for purposes of 18 U.S.C. § 921(a)(20). From 1993 through February 2022, Colorado's POWPO statute prohibited a person convicted of any felony from possessing a firearm.  *Id.* § 18-12-108 (1994).  As of March 1, 2022, however, Colorado amended its POWPO statute to apply only to certain enumerated felonies.  *Id.* § 18-12-108 (2022).  Defendant has never been convicted of the felonies enumerated in Colorado's current POWPO statute.

---

[5] Colorado automatically restores some—but not all—civil rights upon completion of a felon's prison sentence.  *See, e.g.*, Colorado Constitution, art. VII, § 10 (right to vote); Colo. Rev. Stat. § 18-1.3-401(3) (right to hold public office).

In asserting that his civil right to possess firearms has been restored for purposes of § 921(a)(20), Defendant argues—without supporting legal authority—that the Court should not consider the status of Defendant's right to possess a firearm as of the date of the charged offense (i.e., July 23 through August 18, 2018) but instead, should consider Defendant's status as of the date his federal indictment issued (i.e., June 23, 2023). [Doc. 50 at 6–8]. Several circuits have considered and rejected similar arguments. *See, e.g.*, *United States v. Kahoe*, 134 F.3d 1230 (4th Cir. 1998) (denying dismissal of § 922(g)(1) charge and noting that the "plain language of § 921(a)(20) means that a conviction that has been set aside can no longer be disabling," but "does not provide that such a conviction was not disabling between the time it was obtained and the time it was set aside").

For example, in *United States v. Lloyd*, 184 F.3d 695 (7th Cir. 1999), the defendant pled guilty to a predicate felony in March 1991 and completed probation for that offense in August 1992, *id.* at 696. Several years later, the defendant was indicted for an August 7, 1991 offense and charged under § 922(g)(1). *Id.* The defendant argued that § 922(g)(1) did not apply because his civil rights were restored in August 1992, after the date of the offense charged (August 7, 1991) but before his indictment in 1997. *Id.* The Seventh Circuit rejected the defendant's argument and held that the date of indictment was not the relevant inquiry. *Id.* at 697–99. Instead, the court looked to the defendant's "status" on the date of the offense charged—i.e., August 7, 1991. *Id.* This Court finds *Lloyd*'s reasoning persuasive.

Moreover, an approach that looks to the status of a defendant's civil rights on the date of the charged offense is consistent with case law from the Tenth Circuit, which looks

to the state law in effect at the time a defendant becomes eligible for restoration of his civil rights. *See, e.g.*, *United States v. Griffith*, 928 F.3d 855, 871 (10th Cir. 2019) ("We consider the [state] statute in effect at the time [the defendant] was eligible to have his civil rights restored." (citation omitted)); *United States v. Norman*, 129 F.3d 1393, 1397 (10th Cir. 1997) (same).[6]   Courts within this District have looked to the status of Colorado's POWPO law in effect at the time a defendant completed his prison sentence to determine whether a previous felony conviction qualifies under § 922(g)(1). *See, e.g.*, *United States v. Petersen*, 277 F. Supp. 2d 1089, 1095 (D. Colo. 2003) (denying motion to dismiss indictment upon finding that "restoration of defendant's civil rights in 1998 . . . was limited by Colorado law then in effect which prohibited his possession of firearms") (citing Colo. Rev. Stat. § 18-12-108 (1994)); *United States v. Margheim*, No. 10-cr-00326-PAB-17, 2015 WL 13665041, at *5 (D. Colo. Dec. 10, 2015) (finding defendant's 1990, 1993, and 2003 convictions qualifying for purposes of § 922(g)(1) because defendant did not complete his sentences until after Colorado passed its ban on possession of firearms by convicted felons).   Thus, "to determine whether state law expressly restricts a felon's right to possess firearms, we look to the whole of state law," *United States v. Baker*, 508 F.3d 1321, 1328 (10th Cir. 2007) (quotation omitted), as it existed at the time Defendant completed his sentences, *see Griffith*, 928 F.3d at 871.

---

[6] Indeed, Defendant effectively concedes this point.  [Doc. 50 at 7 (citing *Norman* for proposition that "if [the defendant] could possess a firearm under state law when his other rights were restored (i.e., when he was released from custody), then that conviction cannot be a predicate for § 922(g)(1)")].

As of 2018, Colorado law barred Defendant from possessing a firearm.[7]  Thus, the "restoration of [D]efendant's civil rights . . . was limited by Colorado law then in effect which prohibited his possession of firearms."  *See Petersen*, 277 F. Supp. 2d at 1095. Because Defendant has not established that his civil rights were fully restored as of 2018, on the dates of the charged offenses, Defendant has not demonstrated that his prior felony convictions are excludable under § 921(a)(20).  *See Lloyd*, 184 F.3d at 697–99.

Accordingly, the Court cannot find as a matter of law that Defendant's civil rights were restored within the meaning of § 921(a)(20).  For these reasons, Defendant's First Motion to Dismiss is respectfully **DENIED**.

## SECOND MOTION TO DISMISS

Next, Defendant argues that the Indictment and Superseding Indictment against him should be dismissed with prejudice due to the Government's alleged violations of the Interstate Agreement on Detainers ("IAD"), 18 U.S.C. app. § 2.  [Doc. 51].

## I.    Interstate Agreement on Detainers

The IAD is a congressionally sanctioned, interstate compact entered by forty-eight states, the United States, and the District of Columbia, and "establish[es] procedures for resolution of one State's outstanding charges against a prisoner of another State."  *New York v. Hill,* 528 U.S. 110, 111 (2000).  The IAD provides two different procedures for "expeditious delivery of the prisoner" from the "sending State" to the "receiving State,"

---

[7] While the precise timing of Defendant's release from custody for his previous convictions remains unclear from the record in this case, *see* [Doc. 12], Colorado's POWPO law barred Defendant from possessing a firearm at any point between 1993 and February 2022, *see* Colo. Rev. Stat. § 18-12-108 (1994).

*Alabama v. Bozeman,* 533 U.S. 146, 148 (2001), where charges are pending, *see* 18 U.S.C. app. § 2, art. II.[8]

First, under Article IV, if the receiving State has filed a detainer and has made a written request for temporary custody of the defendant, the IAD gives the receiving State the right to obtain a prisoner for purposes of trial. Pursuant to Article IV(c), the receiving State must try the prisoner within 120 days of his arrival; and pursuant to Article IV(e), the receiving State must not return the prisoner to the sending State prior to that trial. 18 U.S.C. app. § 2, art. IV(c) and (e); *see also Alabama v. Bozeman,* 533 U.S. 146, 151 (2001).

Second, under Article III, if the receiving State has filed a detainer against a prisoner in the custody of a sending State, the prisoner has the right to request a final disposition of all "untried indictment[s], information[s], or complaint[s]" in the receiving State. 18 U.S.C. app. § 2, art. III(a). Pursuant to Article III(c), when a detainer is lodged against a prisoner, the warden or another prison official must "promptly inform [the prisoner] of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition" of the detainer charges. If a prisoner requests a final disposition, he has a right to be brought to trial by the receiving State within 180 days of that request. *Id.* art. III(a).

Violations of certain provisions of the IAD warrant mandatory dismissal of an indictment. *See* 18 U.S.C. app. § 2, art. V. Article V of the IAD expressly mandates dismissal of an indictment in only three circumstances: (1) if a prisoner transferred to the receiving State is returned to the sending State prior to the completion of trial, in violation

---

[8] The United States is a "state" for purposes of the IAD. 18 U.S.C. app. § 2, art. II(a).

of Article IV(e)'s "anti-shuttling" provision; (2) if the receiving State fails to accept temporary custody of the prisoner after filing a detainer, in violation of Article V(c); and (3) if a prisoner is not brought to trial within the 180- or 120-day time periods proscribed by Articles III(a) and IV(c), respectively.

## II.    Application

Defendant has moved for dismissal of the Indictments under both Articles III and IV of the IAD.  *See generally* [Doc. 51].  According to Defendant, the Government violated the IAD by failing to comply with the notice requirements and "anti-shuttling" provisions of Articles III(c) and IV(e), respectively.  [*Id.*].  The Court considers each in turn.

### A.    Article III(c):  Notice Requirements

Defendant first argues that the Government violated Article III(c) of the IAD by failing to provide Defendant with a copy of his federal detainer and/or instructions for how to request disposition of his case.  [Doc. 51 at 2–4].  The Government counters that, as the receiving State, it should not be held responsible for the CDOC's negligence.  [Doc. 66 at 4–5].  The Government also contends that violations of Article III(c) are not among the limited grounds for dismissal of an indictment contemplated by the IAD.  [*Id.* at 5–6].  The Court respectfully agrees with the Government for the following reasons.

First, the IAD requires that the entity with custody over a defendant—i.e., Colorado, as the sending state—provide notice of a detainer lodged against him.  18 U.S.C. app. § 2, art. III(c).  Here, the CDOC was required to provide Defendant with notice of the federal detainer lodged against Defendant while he was still in CDOC custody.  Even if the CDOC failed to satisfy its obligations to provide Defendant with a copy of the detainer, the United States is not responsible for the CDOC's alleged negligence.  *See, e.g.*, *United*

*States v. Pena-Corea*, 165 F.3d 819, 821–22 (11th Cir. 1999) (holding that the United States should not be responsible for a sending state's negligent violation of the IAD notice requirement); *United States v. Lualemaga*, 280 F.3d 1260, 1264 (9th Cir. 2001) ("[I]t would not be fair to penalize the receiving State, the United States," for Hawaii's failure to strictly abide by Article III(c)'s notice provision); *cf. Fex v. Michigan*, 507 U.S. 43, 52 (1993) (construing the IAD to avoid holding a receiving state responsible for the sending state's negligence).

Second, violation of Article III(c) is not among the three grounds for dismissal of an indictment enumerated in Article V of the IAD. *See* 18 U.S.C. app. § 2, art. V. Courts routinely hold that the only grounds for dismissal of an indictment under the IAD are those specifically enumerated in Article V. *See, e.g.*, *United States v. McIntosh*, 514 F. App'x 783, 794 (10th Cir. 2013) (unpublished) (collecting cases); *Pena-Corea*, 165 F.3d at 821–22 (holding that the remedy of dismissal in IAD cases is limited to specifically stated circumstances that do not include failure to abide by Article III(c)'s notice requirement); *Lara v. Johnson*, 141 F.3d 239, 243 (5th Cir. 1998) (same); *Lualemaga*, 280 F.3d at 1264 (same); *United States v. Robinson,* 455 F.3d 602, 606 (6th Cir. 2006) (same). Thus, the Court concludes that "dismissal of the indictment is not an available remedy for a violation of the notice provisions of the Interstate Agreement on Detainers." *McIntosh*, 514 F. App'x at 794 (quoting *Robinson,* 455 F.3d at 606).

### B.    Article IV(e):  Anti-Shuttling

Defendant next argues that the Indictments should be dismissed pursuant to the IAD because the Government violated Article IV(e) on September 29, 2023, when the United States Marshal took custody of Defendant and "then left him at the Denver County

Jail." [Doc. 51 at 4]. Because the Denver County Jail houses both state and federal prisoners, Defendant contends that a hearing is necessary to resolve whether the state or federal government paid to house Defendant at Denver County Jail from September 29 through October 2, 2023. [*Id.* at 4–5].

In Response, the Government asserts that a hearing is unnecessary because the record establishes that Defendant's weekend at Denver County Jail was spent in federal custody and paid for by the United States Marshal's Office. [Doc. 66 at 7–8]; *see also* [Doc. 66-4 at 2–3 (proof of payment)]. The Government also argues that the single case on which Defendant relies, *United States v. Small*, 209 F. Supp. 2d 1114 (D. Colo. 2002), is factually distinguishable. [Doc. 66 at 7–8]. The Court respectfully agrees with the Government on both points.

In *Small*, the defendant was housed at Denver County Jail for over a year, and the federal government could not demonstrate to the court that the United States Marshal's Office paid Denver County Jail for the defendant's bed space. 209 F. Supp. 2d at 1118, 1122. Because the defendant's bed space was paid for by the state, and not the federal government, the court found that the defendant had been returned to state custody in violation of Article IV(e) of the IAD. *Id.* at 1122.

Here, the record establishes that the United States Marshal's Office paid for Defendant's bed space at the Denver County Jail on the weekend in question. [Doc. 66-4 at 2–3].[9] Indeed, the record establishes that Defendant was a federal prisoner after federal ATF agents picked him up from DRDC on September 29, 2023, for transport to the Denver County Jail. [Doc. 66-3 at ¶ 1]. Because Defendant was housed at Denver

---

[9] In light of this information, Defendant's request for a hearing is **DENIED** as **moot**.

County Jail for the weekend as a federal inmate, the federal government paid for Defendant's bed space. [Doc. 66-4 at 2–3]. Then, after Defendant's initial appearance on Monday, October 2, 2023, he was transferred to Washington County Jail, which is a federal facility. [Doc. 5; Doc. 11]. In other words, Defendant was neither returned to nor "left" in state custody after being contacted by the ATF and taken into federal custody.

Thus, while a violation of Article IV(e) constitutes grounds for dismissal pursuant to Article V, Defendant has failed to establish a violation of Article IV(e) of the IAD. The Court therefore concludes that Defendant has failed to demonstrate that dismissal of the indictment is warranted under Article V. Accordingly, the Second Motion to Dismiss is respectfully **DENIED**.

## THIRD MOTION TO DISMISS

In his Third Motion to Dismiss, Defendant asserts facial and as-applied challenges to the constitutionality of § 922(g)(1) on grounds that Congress exceeded its authority under the Commerce Clause. [Doc. 53]. Defendant concedes, however, that his arguments for dismissal are "currently foreclosed by Tenth Circuit precedent." [*Id.* at 1]. Accordingly, Defendant expressly "raises these issues for preservation purposes only." [*Id.* at 10]. Because Defendant's arguments for dismissal are indeed currently foreclosed by Tenth Circuit precedent, *see, e.g.*, *United States v. Patton*, 451 F.3d 615, 634–35 (10th Cir. 2006); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), the Court respectfully **DENIES** Defendant's Commerce Clause challenges to the constitutionality of § 922(g)(1).

**FOURTH MOTION TO DISMISS**

In his Fourth Motion to Dismiss, Defendant argues that § 922(g)(1) is facially unconstitutional in light of the United States Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). [Doc. 52]. Defendant further contends that post-*Bruen*, there is no binding Tenth Circuit precedent that addresses the constitutionality of § 922(g)(1). [*Id.* at 8]. The Court respectfully disagrees.

In *United States v. McCane*, the Tenth Circuit rejected the defendant's argument that § 922(g) violates the Second Amendment. 573 F.3d at 1047. In upholding the constitutionality of § 922(g)(1), the Tenth Circuit looked to the Supreme Court's 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Relevant here, the Tenth Circuit noted that the Supreme Court "explicitly stated in *Heller* that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'" *McCane*, 573 F.3d at 1047 (quoting *Heller*, 554 U.S. at 626).

In 2022, the Supreme Court articulated a new, two-part test for determining the scope of the Second Amendment and the constitutionality of firearm regulations in *Bruen*. 597 U.S. at 17. Post-*Bruen*, the Tenth Circuit again considered the constitutionality of § 922(g)(1) in *Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023), *cert. granted*, *judgment vacated*, 144 S. Ct. 2708 (2024). In *Vincent*, the Tenth Circuit noted that

> the [Supreme] Court didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons. If anything, *Bruen* contains two potential signs of support for these prohibitions.
>
> First, six of the nine Justices pointed out that *Bruen* was not casting any doubt on this language in *Heller*.
>
> Second, *Bruen* apparently approved the constitutionality of regulations requiring criminal background checks before applicants could get gun permits. In *Bruen*, the Court struck down state regulations that had required

the showing of a special need before someone could get a license to carry a gun. But the Court added that it wasn't questioning the constitutionality of "shall-issue" licensing regimes. These regimes don't require a showing of special need, but they do "often require applicants to undergo a background check" to ensure that the applicant is a "law-abiding, responsible citizen[]."

. . .

Given the six Justices' reaffirmation of the *Heller* language and the Court's apparent approval of "shall-issue" regimes and related background checks, we conclude that *Bruen* did not indisputably and pellucidly abrogate our precedential opinion in *McCane*.

80 F.4th at 1201–02 (footnote and citations omitted). Accordingly, the Tenth Circuit again upheld the constitutionality of § 922(g)(1) pursuant to *McCane*. *Id.* at 1202.

Next, the Supreme Court decided *United States v. Rahimi*, 144 S. Ct. 1889 (2024),[10] which involved a constitutional challenge to a different provision of § 922(g) than the one under which Defendant is charged in this case. *See Rahimi*, 144 S. Ct. at 1898–1902. In that case, the Court applied the two-part test articulated in *Bruen* to determine the constitutionality of § 922(g)(8). *Id.* The Supreme Court concluded "*only this*: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 1903 (emphasis added). The *Rahimi* decision did not examine § 922(g)(1) at all, except to reiterate that "prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id.* at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26).

While the Supreme Court granted certiorari in *Vincent*, vacated the judgment, and remanded the case to the Tenth Circuit "for further consideration" in light of *Rahimi*,[11] it

---

[10] Defendant does not cite *United States v. Rahimi*, 144 S. Ct. 1889 (2024), in his Fourth Motion to Dismiss. *See generally* [Doc. 52].

[11] Similarly, the Supreme Court has granted certiorari, vacated the judgment, and remanded the case to the Tenth Circuit in *United States v. Mayfield*—another challenge

"did not question the merits of *McCane* or express any doubt about the Tenth Circuit's reasoning in *Vincent*," *United States v. Watkins*, No. 24-cr-00058-SKC, 2024 WL 4381340, at *2 (D. Colo. Oct. 3, 2024) (citing *Vincent v. Garland*, 144 S. Ct. 2708 (2024)).[12]  Indeed, one week after the Supreme Court's decision in *Rahimi*, the Tenth Circuit considered whether *Rahimi* abrogated *McCane*.  *See United States v. Curry*, No. 23-1047, 2024 WL 3219693, at *4 & n.7 (10th Cir. June 28, 2024) (observing that *Bruen* neither overruled nor expressly abrogated *McCane* and finding that *Rahimi* also "does not indisputably and pellucidly abrogate" *McCane* (quotation omitted)).  District courts within the Tenth Circuit presented with post-*Rahimi* challenges to § 922(g)(1) have also upheld its constitutionality under *McCane*.  *See, e.g.*, *Watkins*, 2024 WL 4381340, at *2; *United States v. Hawkins*, No. 6:23-cr-10041-EFM, 2024 WL 4751401, at *1 (D. Kan. Nov. 12, 2024) (denying motion to dismiss based on a facial and as-applied challenges to the constitutionality of § 922(g)(1) on Second Amendment grounds); *United States v. Sutton*, No. 4:24-cr-00168-SEH, 2024 WL 3932841, at *4 (N.D. Okla. Aug. 23, 2024) ("Because neither *Bruen* nor *Rahimi* indisputably and pellucidly abrogated *McCane*, *McCane* remains binding authority upon this Court.")

Neither *Bruen* nor *Rahimi* overruled or abrogated *McCane*, which remains binding Tenth Circuit precedent.  Accordingly, Defendant's Second Amendment challenge to § 922(g)(1) is respectfully **DENIED**.

---

to the constitutionality of § 922(g)(1) after *Bruen* and *Rahimi*.  *United States v. Mayfield*, No. 24-5488, 2024 WL 4654943, at *1 (U.S. Nov. 4, 2024).

[12] This is often referred to as "GVR order"—i.e., a "grant, vacatur, and remand" order. The Government argues that *Vincent* remains persuasive authority after *Rahimi* because a GVR order is "not a final determination on the merits."  [Doc. 62 at 7 n.1 (quotation omitted)].  The Court respectfully agrees.

## MOTION TO EXCLUDE

The Government previously notified Defendant of its intent to offer evidence of the August 18, 2018 shooting as intrinsic evidence that Defendant possessed the firearm on that date.  [Doc. 54-1].  Defendant seeks to exclude all evidence of the shooting as improper under Rule 404(b) and as unfairly prejudicial under Rule 403 of the Federal Rules of Evidence.  [Doc. 54].[13]

## I.    Rule 404(b)

Rule 404(b) governs the admissibility of evidence of a defendant's other crimes, wrongs, or bad acts and—with two exceptions—bars admitting such evidence to prove "a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  The first exception applies to "intrinsic" evidence insofar as Rule 404(b) covers only evidence that is extrinsic to the crime charged.  *United States v. Kupfer*, 797 F.3d 1233, 1238 (10th Cir. 2015).  Intrinsic evidence includes evidence that (1) is "inextricably intertwined" with, (2) "occurred within the same time frame" as, or (3) constituted a "necessary preliminary" to the charged conduct; (4) produced direct proof of background information directly connected to the crime's factual circumstances; or (5) equips the jury with necessary background and context of a defendant's relationship to his accomplice.  *Id.* (citations omitted).  The second exception to Rule 404(b)'s bar applies to extrinsic evidence offered for the narrow

---

[13] Defendant also "objects to the admission of evidence that he was in possession of drugs or drug paraphernalia under the same legal theories."  [Doc. 54 at 1, 8].  But as the Government points out in its Response, [Doc. 64 at 3–4], the notice does not seek the admission of evidence of drugs or drug paraphernalia, *see generally* [Doc. 54-1]. Therefore, Defendant's objection appears to be moot.

purposes of proving a defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

Defendant argues that evidence of the shooting should be excluded under Rule 404(b) as improper extrinsic evidence. *See generally* [Doc. 54]. According to Mr. Jones-El, the only intrinsic evidence of his possession of the stolen firearm is (a) evidence relating to the July 23, 2018 theft, and (b) testimony from responding officers about their August 18, 2018 pursuit of Defendant and the firearm recovered nearby. [*Id.* at 4]. The Court respectfully disagrees.[14]

The Superseding Indictment charges Defendant with firearm possession crimes with offense dates beginning July 23, 2018 (the date the LC9 Ruger was stolen) through August 18, 2018. [Doc. 28]. At approximately 4:38 a.m. on August 18, 2018, law enforcement officers responded to a call *reporting a shooting*. [Doc. 64 at 1]. A description of the suspected shooter prompted responding officers to attempt contact with Defendant—who was in the area and matched the description of the suspect—at 4:44 a.m. [*Id.* at 2]. When officers responding to the shooting attempted to contact Defendant, he fled—leading to a brief pursuit before his arrest and the recovery of the pink Ruger LC9 nearby. [*Id.*]. The shooting is thus "intertwined with the discovery of the firearm and therefore necessary to understand the flow of events and put police conduct in context." *United States v. Gorman*, 312 F.3d 1159, 1162 (10th Cir. 2002). Indeed, insofar as the shooting prompted responding officers to attempt contact with Defendant minutes later, it is "directly connected to the factual circumstances of the crime[s] [charged] and provides

---

[14] Because the Court finds that the challenged evidence is intrinsic, and therefore not subject to Rule 404(b) analysis, the Court does not reach Defendant's Rule 404(b) arguments.

contextual or background information to the jury." *Kupfer*, 797 F.3d at 1238; *see also United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011) ("[O]ther act evidence is intrinsic—and thus not subject to Rule 404(b)—when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode." (cleaned up)).

The Court thus finds that evidence of the August 18, 2018 shooting is intrinsic evidence not subject to Rule 404(b) analysis. Accordingly, Defendant's request to exclude evidence of the shooting on Rule 404(b) grounds is respectfully **DENIED**.

## II.    Rule 403

Defendant also argues that evidence related to the shooting should be excluded under Rule 403 because the risk of unfair prejudice outweighs its probative value. [Doc. 54 at 7–8]. Even intrinsic evidence must still be admissible under Rule 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403.

While the Court recognizes Defendant's concern that evidence of the shooting may be "viscerally alarming," [Doc. 54 at 7], exclusion of evidence under Rule 403 is "an extraordinary remedy [that] should be used sparingly," *Irving*, 665 F.3d at 1213 (quotation omitted). Defendant has not convinced the Court that the risk of prejudice substantially outweighs the probative value of this evidence. To the contrary, whether Defendant shot the firearm on August 18, 2018, immediately before it was discarded and recovered by law enforcement, goes directly to whether Defendant knowingly possessed a firearm on

that date. Accordingly, the Court respectfully **DENIES** Defendant's request to exclude evidence of the shooting under Rule 403.[15]

**CONCLUSION**

For the foregoing reasons, it is **ORDERED** that:

(1)     Defendant's Motion to Dismiss Count One of Indictment—Civil Rights Restored [Doc. 50] is **DENIED**;

(2)     Defendant's Motion to Dismiss Indictment—Detainer [Doc. 51] is **DENIED;**

(3)     Defendant's Motion to Dismiss Count One of Indictment—*Bruen* [Doc. 52] is **DENIED;**

(4)     Defendant's Motion to Dismiss Count One of Indictment—*Bruen* Preservation is **DENIED**;

(5)     Defendant's Motion to Exclude Evidence Pursuant to F.R.E. 404(b) is **DENIED**; and

(6)     On or before **January 6, 2024**, the Parties shall meet and confer with respect to the requirements of the Speedy Trial Act and shall file a joint status report setting forth their position(s) as to the applicable Speedy Trial Act date, for purposes of resetting the trial.

DATED: December 23, 2024                BY THE COURT:

_____
Nina Y. Wang
United States District Judge

---

[15] Though unrelated to the substantive analysis of these Motions, this Court notes that some of the concerns that Mr. Jones-El raised during the December 9, 2024 hearing before the Court, [Doc. 74], have been raised by counsel in the instant Motions, addressed by this Order, and may be subject to appeal.